IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

VOUGHT AIRCRAFT INDUSTRIES, §
INC., §
                              §
            Plaintiff, §
                              § Civil Action No. 3:08-CV-0727-D
VS. §
                              §
FALVEY CARGO UNDERWRITING, §
LTD., et al., §
                              §
            Defendants. §

MEMORANDUM OPINION
AND ORDER

     The parties' cross-motions for summary judgment present
questions concerning the interpretation of a marine cargo insurance
policy, the insurer's liability for its handling of the insured's
claim, and the validity of related common law claims.  The court
must also address questions concerning the admissibility of certain
summary judgment evidence and the availability of an affirmative
defense of ambiguity.

I

A

     This is an action by plaintiff Vought Aircraft Industries,
Inc. ("Vought") against Falvey Cargo Underwriting, Ltd. ("Falvey");
XL London Market, Limited, acting on its own behalf, and on behalf
of the underwriting members of Lloyd's Syndicate 1209, and all
other Lloyd's Syndicates participating on the policy ("XL"); and
Dornoch Limited, for and on behalf of the underwriting members of
Lloyd's Syndicate 1209 and all other Lloyd's Syndicates

participating on marine cargo policy No. M-20108, WC-20108 ("Dornoch").[1]  Vought sues to recover for breach of a Marine Cargo Policy No. M-20108, WC-20108 (the "Policy") and on other claims arising from its repair of a horizontal stabilizer[2] that was damaged while being shipped by rail to Vought's customer, The Boeing Company ("Boeing").  Vought manufactured the horizontal stabilizer for installation on a C-17 Globemaster III aircraft being built by Boeing for the United States Air Force ("Air Force").  It is undisputed that the damage to a horizontal stabilizer in shipment is a covered peril under the Policy.

Vought is the named insured in the Policy.  According to Vought,[3] Falvey is the insurer, and it placed the risk with certain

---

[1]Vought originally sued Lloyd's of London, but it voluntarily dismissed this defendant by Fed. R. Civ. 41(a)(1)(A)(i) notice of dismissal on June 2, 2008.

[2]The stabilizer is a horizontal wing atop the tail fin that helps the plane maintain level flight.

[3]Both sides have moved for summary judgment.  As the court has stated in cases like *AMX Corp. v. Pilote Films*,

> [b]ecause both parties have filed motions for summary judgment, the court will principally recount only the evidence that is undisputed. If it is necessary to set out evidence that is contested, the court will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence.  In this way it will comply with the standard that governs resolution of summary judgment motions.

*AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5) (Fitzwater, J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard*

- 2 -

Underwriters in the Lloyd's, London insurance market; Dornoch is the lead underwriter; and XL is liable for Vought's claim because it is an insurer on the Policy and serves as managing agent for all underwriters of Syndicate 1209, including Dornoch.

After the horizontal stabilizer was damaged, Vought conferred with Boeing and the Air Force. The three agreed that Vought should repair the stabilizer due to its highly-specialized design, which made it infeasible for another company to repair it. Vought informed Falvey of the repair plan and that it intended to make a claim for reimbursement of the repair costs.[4]

The damaged horizontal stabilizer was returned to Vought's Dallas facility. Because Vought does not maintain a dedicated repair facility, it was placed on the factory floor with other C-17 stabilizers, adjacent to the regular production line. To maintain its normal production schedule, it was necessary for Vought to repair the stabilizer while simultaneously continuing with normal production. Vought was required to deliver horizontal stabilizers to Boeing on a specific schedule. When the damaged stabilizer was

---

*Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)), *modified in part on other grounds*, 2007 WL 2254943 (N.D. Tex. Aug. 7, 2007) (Fitzwater, J.).

[4]Although the court assumes that Vought informed Falvey of the repair plan, the court holds below, *see infra* § VIII, that a reasonable jury could not find that Falvey and Vought entered into a binding contract regarding the repair of the stabilizer. Therefore, Vought cannot recover on its independent claim for breach of a contract to repair the stabilizer.

returned to Vought, it did not have a completed stabilizer to provide Boeing as a replacement. To fill this gap, Vought expedited production and shipment of the next available stabilizer on the assembly line, which it shipped to Boeing as a replacement for the damaged stabilizer. This, in turn, created another gap in the production schedule, requiring Vought to expedite the production and shipment of successive stabilizers. Six stabilizers were completed on an expedited basis before the damaged stabilizer was repaired and inserted back into the production schedule and the normal delivery schedule was restored.

Vought submitted a claim to Falvey for $1,658,056.00, which consisted of $136,748.00 in direct labor costs, $71,552.00 in fringe benefits, and $15,306.00 in direct materials to repair the damaged stabilizer, totaling $223,606.00. Vought also requested reimbursement for $284,509.00 in overhead expenses incurred in repairing the damaged stabilizer. This sum was composed of $206,920.00 in "Direct Overhead," which included depreciation of facilities, equipment, and tools; some supervisor salaries; and all other costs that did not result from direct labor charges but that could be assessed to a particular manufacturing process. The balance of this request consisted of $77,589.00 in "General and Administrative Costs" composed of overhead that could not be associated with a particular manufacturing task, such as executive salaries or benefits for retired workers. These costs were spread

- 4 -

equally across all of Vought's manufacturing operations as a percentage above actual cost.

The final component of Vought's reimbursement request was for costs incurred by diverting resources to the repair of the damaged stabilizer and expediting production and shipment of the stabilizer that was completed and shipped as a replacement for the damaged stabilizer and the next five that were completed and shipped to cover the production gap until the original damaged stabilizer was reinserted into the production line and normal production and delivery resumed.  This claim consisted of $663,854.00 in expedited repair costs, $313,730.00 of direct overhead associated with these expediting costs, and $172,357.00 of general and administrative costs associated with these expediting costs.

After Falvey received Vought's claim, it engaged the accounting firm of Matson, Driscoll & Damico, LLP ("Matson") to evaluate the claim.  Falvey instructed Matson not to consider Vought's overhead costs as part of the claim.  Matson determined that Falvey was obligated to pay $236,274.00, minus a $100,000.00 deductible, for direct labor repair costs, fringe benefits on such repair costs, and direct material costs that Vought had incurred in repairing the damaged horizontal stabilizer.  Falvey later tendered this amount and also reimbursed Vought $11,205.00 for the cost of shipping the repaired stabilizer back to Boeing.  Falvey refused Vought's demand for the full amount of its claim.

B

The Policy "cover[s] all shipments of goods and/or merchandise and/or property," Ds. Oct. 10, 2009 App. 5, including by rail, *id.* at 6.  Vought's aircraft parts are insured "[a]gainst all risks of physical loss or damage from any external cause, except those risks as may be excluded by [two specific warranties] or other warranties or exclusions specified in this policy, unless covered elsewhere [in the Policy][.]"  *Id.* at 10.  The Policy provides in § 16.2.5 that "the insurer is to pay for . . . any physical loss or damage to . . . goods . . . during land transportation, from . . . collision."  *Id.* at 11.  It covers the transportation of goods from the time they leave Vought's facility until they are delivered to Boeing and unloaded.  *See id.* at 11 and 13.

Vought relies primarily on two clauses in the Policy to establish its right to reimbursement for its entire claim: § 24, the Policy's "Machinery" clause ("Machinery Clause"), and § 38, captioned "Expediting Cost" ("Expediting Cost Clause").  Where the covered item is a machine or an article consisting of multiple parts, the Machinery Clause limits Vought's liability under § 16.2 to the damaged parts:

> When the goods and/or merchandise and/or property insured under this policy include a machine or other article consisting, when complete for sale or use, of several parts, then in case of loss or damage covered by this insurance to any part of such machine or other article, This Insurer shall be liable only for the proportion of the insured value applicable

> to the part or parts lost or damaged, or at The Insured's option, for the cost and expense of replacing or repairing, assembling or duplicating the lost or damaged part or parts (including any and all expediting, labor and installation charges) and all other necessary charges so that the machine or article is restored to its condition at the time of shipment.

*Id.* at 15.[5]  The Expediting Cost Clause states:

> Where there is loss [or] damage . . . which [is], or will be, the subject of a claim under this policy, and The Insured considers it necessary to forward replacements and/or replacement parts by means other than the means by which the original shipment was dispatched, The Insurer will pay the expediting costs so involved and any overtime repair costs and/or other additional expenses including duties, taxes and destination charges, in addition to the underlying claim.

*Id.* at 20.   Additionally, § 54, captioned "Constructive Total Loss," provides:

> No recovery for a constructive total loss shall be had under this policy unless (i) the insured goods . . . are reasonably abandoned on account of their actual total loss appearing to be unavoidable, or (ii) because they cannot be preserved from actual total loss without incurring an expenditure which, if incurred, The Insured reasonably believes would exceed the expected value of the goods

---

[5]Vought characterizes the stabilizer both as an article consisting, when complete for sale, of separate parts and as a "damaged part" that can itself be declared a total loss, thus allowing Vought to recover the full value of the stabilizer. *See* P. Oct. 9, 2009 Br. 7.  By characterizing the damaged stabilizer as one part, Vought essentially treats the Machinery Clause as a coverage provision rather than as a limitation on the coverage provided by § 16.2.  This approach affects its interpretation of the Expediting Clause. *See infra* § IV(C)(3)(c).

- 7 -

[.]

*Id.* at 26.  And § 45 states that the Policy "shall not cover loss [ ] of market or loss, damage, or expense arising from delay, . . . unless such risks are expressly assumed elsewhere in this policy." *Id.* at 22.

C

Vought filed this lawsuit in state court, and defendants removed it based on diversity of citizenship.  Vought alleges claims for breach of contract (breach of the Policy), breach of the duty of good faith and fair dealing, unfair insurance practices under Chapter 541 of the Texas Insurance Code, breach of contract (breach of the repair agreement), promissory estoppel, quantum meruit, and unjust enrichment.  Besides its noncontractual claims, Vought seeks to recover the sum of $1,410,577.00 for the balance of its claim under the Policy that defendants have not already covered.

Vought moves for partial summary judgment on its breach of contract claim, contending that it is entitled to judgment for the unpaid balance of its claim.  Falvey, XL, and Dornoch move for summary judgment on all of Vought's claims.  XL moves in the alternative for summary judgment on the ground that it cannot be held liable because it was acting as an agent for Dornoch, a disclosed principal.

II

The parties' summary judgment burdens depend on whether they will have the burden of proof at trial on the particular claim or defense to which the motion is addressed.    To be entitled to summary judgment on a claim or defense for which it will have the burden of proof at trial, a party "must establish 'beyond peradventure all of the essential elements of the claim or defense.'"  *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  This means that the party must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law.   *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003).    "The court has noted that the 'beyond peradventure' standard is 'heavy.'"  *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

Concerning a claim or defense for which the party will not have the burden of proof at trial, the party can meet its summary judgment obligation by pointing the court to the absence of evidence to support the claim or defense.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Once it does so, the nonmovant must go beyond its pleadings and designate specific facts showing

- 9 -

that there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).   An issue is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The failure of the party with the burden of proof to produce evidence as to any essential element renders all other facts immaterial.  *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).   Summary judgment is mandatory if that party fails to meet this burden.  *See Little*, 37 F.3d at 1076.

III

The court begins by addressing together Vought's motion for partial summary judgment and the part of defendants' motion for summary judgment that seeks dismissal of Vought's claim for breach of the Policy.[6]

A

As a threshold question, the court must address the legal standards that govern its interpretation of the Policy.  Texas courts interpret insurance policies according to the rules of contract interpretation.  *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 291 (5th Cir. 2005) (citing *Kelley-Coppedge, Inc. v. Highlands*

---

[6]Although defendants did not plead ambiguity, the court can consider whether the Policy is ambiguous.  *See infra* § XIII(B).

- 10 -

*Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("Interpretation of insurance contracts in Texas is governed by the same rules as the interpretation of other contracts."). When a "contract is worded so that it can be given a definite meaning, it is unambiguous and a judge must construe it as a matter of law." *Int'l Ins.*, 426 F.3d at 291; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991). "In applying these rules, a court's primary concern is to ascertain the parties' intent as expressed in the language of the policy." *Int'l Ins.*, 426 F.3d at 291; *see also Forbau*, 876 S.W.2d at 133 ("[T]he court's primary concern is to give effect to the written expression of the parties' intent."). The court must give effect to all of a policy's provisions so that none is rendered meaningless. *Int'l Ins.*, 426 F.3d at 291.

"Whether an insurance contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Int'l Ins.*, 426 F.3d at 291 (citing *Kelley-Coppedge*, 980 S.W.2d at 464). "If an insurance contract uses unambiguous language, [the court] must enforce it as written. If, however, a contract is susceptible to more than one reasonable interpretation, [the court] will resolve any ambiguity in favor of coverage." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23

- 11 -

(Tex. 2008) (footnotes omitted); *see also Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).

An exception to the general rule in favor of coverage is often made when corporate insureds with bargaining power equal to the insurer participate in drafting the insurance coverage.

> One of the frequently cited reasons for interpreting language in favor of the insured is that insurance policies are generally contracts of adhesion, which offer little choice to the purchaser. This justification, though, has little application [where], as is often the situation with large, knowledgeable business firms, the contracts were manuscript policies negotiated and drafted by the insured.

*Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002).[7]  The exception is justified where the insured

---

[7]*See also Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 638 (7th Cir. 1991) ("However, it is clear that the rule is grounded in the need to protect an insured from an insurer who has had exclusive control of the drafting process.  That concern is not implicated here."); *E. Associated Coal Corp. v. Aetna Cas. & Sur. Co.*, 632 F.2d 1068, 1075 (3d Cir. 1980) ("[T]he principle that ambiguities in policies should be strictly construed against the insurer does not control the situation where large corporations, advised by counsel and having equal bargaining power, are the parties to a negotiated policy."); *AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1265 (Cal. 1990) ("[W]here the policyholder does not suffer from lack of legal sophistication or a relative lack of bargaining power, and where it is clear that an insurance policy was actually negotiated and jointly drafted, we need not go so far in protecting the insured from ambiguous or highly technical drafting.") (construing ambiguity in favor of insured because policy was drafted by insurer); *Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 843 A.2d 1094, 1103 (N.J. 2004) ("An exception to [the rule] exists for sophisticated commercial entities that do not suffer from the same inadequacies as the ordinary unschooled policyholder and that have participated in the drafting of the insurance contract.").

- 12 -

contributes to the drafting of the agreement rather than adopting a contract of adhesion,[8] the contents of the policy are in some way negotiable, and the insured is as capable as the insurer of interpreting the contract. *See Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Ill.*, 162 F.3d 789, 794 (3d Cir. 1998) ("The doctrine of *contra preferentum* is based on the fact that insurance contracts are in most instances 'nonnegotiable' since they tend to be drafted solely by the insurance industry. When a contract is drafted by the insured or jointly negotiated, the doctrine does not apply.") (internal quotation marks and citation omitted).[9]  The exception also applies where the contract is prepared by a broker acting for the insured. *See Newport*, 162 F.3d at 794-95 (applying exception where "the insurance policy was drafted by an independent broker who was hired by [plaintiff] and

---

[8]Vought also contends that allowing an exception to the traditional rule of interpretation for large corporations would mean an identical policy could be interpreted differently, depending on whether it was purchased by an individual or a corporation. But because the exception is limited to policies drafted at least in part by corporations, this concern is unfounded.

[9]*See also Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 958 (5th Cir. 2009) (applying Louisiana law) ("[T]he presumption [in favor of coverage] does not apply where the insured is a sophisticated commercial entity that itself drafts or utilizes its agent to secure desired policy provisions."); *Eagle Leasing Corp. v. Hartford Fire Ins. Co.*, 540 F.2d 1257, 1261 (5th Cir. 1976) ("There is no purpose in following a legal platitude that has no realistic application to a contract confected by a large corporation and a large insurance company each advised by competent counsel and informed experts.") (applying Missouri law).

acted in consultation with [plaintiff's] employees).[10]

Neither the court nor the parties are aware of a Texas case that addresses the sophisticated insureds exception. But Texas courts have made clear that the traditional rule of construction is based on an insured's unequal bargaining power, the special relationship between the insured and the insurer, and the general principle that contracts are construed against the drafting party. *See Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 n.1 (Tex. 1998).[11] Where the sophisticated insureds exception applies, these concerns are not in play. Such insureds draft the policy, or at least play a role in drafting it. They are not presented a

---

[10]*See also Travelers Indem. Co. v. United States*, 543 F.2d 71, 74 (9th Cir. 1976)("[T]he rule of strict construction has no applicability when the language is supplied by the insured, his agent or his broker."); *Marine Trans. Corp. v. Nw. Fire & Marine Ins. Co.*, 2 F. Supp. 489, 492 (E.D.N.Y.) ("The contract was prepared by brokers acting for the assured, and consequently is not to be most strongly construed against the company."), *modified on other grounds*, 67 F.2d 544 (2d Cir. 1933).

[11]Vought argues that Texas courts (and courts from other states) have applied the traditional rule in favor of corporate insureds, and it cites *Pioneer Chlor Alkali Co. v. Royal Indemnity Co.,* 879 S.W.2d 920 (Tex. App. 1994, no writ), as an example. But the sophisticated insureds exception is not based on the corporate nature of the insured. It rests instead on the insured's role in drafting the policy. This is because, as the court in *Pioneer Chlor* observed, the traditional rule of construction is based on the insured's lack of participation in the drafting process. "Generally, in the insurance context, the language and terms of the policy are chosen by the insurance company. Therefore, if the language chosen is ambiguous or inconsistent, and susceptible of more than one reasonable interpretation, the court must resolve the uncertainty by adopting the construction that most favors the insured." *Id.* at 929 (citations omitted).

- 14 -

policy that contains non-negotiable terms; rather, they can bargain for coverage.  And they are able to interpret the policy on their own, lessening the likelihood that the insurer will take advantage of them.  Accordingly, considering that Texas applies principles that are congruous with the sophisticated insureds exception, the court holds that Texas courts would apply the exception where the facts warrant.

Vought also argues that the sophisticated insureds exception has been rejected more often than it has been accepted.  But most of the cases Vought cites concern corporate insureds who did not participate in drafting the policy; these cases merely hold that the exception is not based on the insured's corporate status alone. *E.g., St. Paul Mercury Ins. Co. v. Grand Chapter of Phi Sigma Kappa, Inc.*, 651 F. Supp. 1042, 1045 (E.D. Pa. 1987) ("Pennsylvania principles of construction require the Court to resolve an ambiguity of this kind in favor of the insured unless the parties possess equal bargaining power, such as when a large corporation, advised by counsel, is the insured.").[12]  They do not involve instances where the insured participated in drafting the policy.[13]

_____

[12]Vought also cites *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1218 (Ill. 1992), and *CPS Chemical Co. v. Continental Insurance Co.*, 536 A.2d 311, 318 (N.J. Super. Ct. App. Div. 1988).

[13]Vought also cites another case involving a corporate insured. In that case, the court did not resolve an ambiguity, but rather determined whether a legal interpretation or the ordinary meaning of a word should be used.  *See Boeing Co. v. Aetna Cas. & Sur. Co.*,

*Ogden Corp. v. Travelers Indemnity Co.*, 681 F. Supp. 169, 173-174 (S.D.N.Y. 1988), did hold under New York law that a sophisticated insured who drafted a policy through its insurance broker was entitled to the benefit of the general rule because it did not draft the policy in its entirety. But this court has found no other case that cites *Ogden* for this principle. Rather, other New York cases indicate that there is an exception to the general rule when sophisticated insureds participate in policy drafting.

> The doctrine of *contra proferentem* does not apply as the evidence submitted on the motions shows that while defendant prepared the drafts of the agreement, the basic concept and terms originated with plaintiff, that plaintiff is sophisticated and was instrumental in crafting various parts of the agreement, and that plaintiff, while not an insurance company, had equal bargaining power and acted like an insurance company by maintaining a self-insured retention.

*Cummins, Inc. v. Atl. Mut. Ins. Co.*, 56 A.D.3d 288, 290 (N.Y. App. Div. 2008); *see also In re Sept. 11th Liab. Ins. Coverage Cases*, 458 F.Supp.2d 104, 118 (S.D.N.Y. 2006) ("[A]pplication of this rule [favoring insureds] is generally inappropriate if both parties are sophisticated.") (citation and internal quotation marks omitted).

---

784 P.2d 507, 513 (Wash. 1990). The court held that unless the insurer could prove that the insurer and the insured intended a specific legal meaning of contract terms, the rule that policy terms were given their ordinary meaning would apply. *Id.* The court determined that the mere fact that the insured was a corporation aided by counsel did not mean that it intended the specific legal definitions to apply. *Id.* at 514. The court reasoned that the policy was still a standard form policy drafted by the insurer. *Id.*

Vought also cites *Eli Lilly & Co. v. Home Insurance Co.*, 794 F.2d 710 (D.C. Cir. 1986) ("*Eli Lilly II*").  *Eli Lilly II* applied the Indiana Supreme Court's answer to certified questions in *Eli Lilly & Co. v. Home Insurance Co.*, 482 N.E.2d 467 (Ind. 1985) ("*Eli Lilly I*").  In *Eli Lilly I* the Indiana Supreme Court held that the traditional rule of interpretation applied in favor of a major pharmaceutical company because, although the company may have been involved in drafting the policies, it was state policy to promote indemnity.  *Eli Lilly I*, 482 N.E.2d at 471.  But assuming that *Eli Lilly I* supports Vought's position, it is not binding on this court, the case has not been extensively followed outside Indiana, and there is no indication that Texas would follow it.

Accordingly, the court holds that the sophisticated insureds exception can conceivably apply in this case.

B

The summary judgment evidence does not permit the court to conclude at the summary judgment stage that the traditional rule or the sophisticated insureds exception applies.

Defendants will have the burden at trial of negating the application of the traditional rule by proving that Vought participated in drafting the Policy.[14]  *See First Nat'l Bank of Fort*

---

[14]Defendants must also show that Vought had equal bargaining power.  If Vought shopped around the same policy to different brokers, defendants could apparently meet this burden even if Vought and its broker did not negotiate over the specific policy contents.

*Walton Beach v. U.S. Fid. & Guar. Co.*, 416 F.2d 52, 56 (5th Cir. 1969) ("[I]t is incumbent upon the insurer to bear the burden of showing that the Bank was instrumental in drafting the [insurance] agreement[.]").  But Vought bears the burden of proof as to its claim for breach of the Policy, and must therefore prove the claim beyond peradventure to obtain summary judgment.  It cannot, therefore, obtain summary judgment on that claim based on the application of the traditional rule of interpretation if defendants present evidence that the sophisticated insureds exception applies.[15]  As explained below, defendants have presented evidence creating a genuine question of fact about the application of the traditional rule of interpretation.

Defendants point to evidence that the footer contains the name of Vought's broker—Marsh USA, Inc. ("Marsh")—stating "0304 Marsh Form." *E.g.*, Ds. Oct. 10, 2009 App. 15.  In a deposition, Cindy Woodruff ("Woodruff"), a Marsh adviser responsible for the Vought account, testified that the Policy was a manuscript policy form—i.e., a specially designed form rather than an insurer's

---

[15]Because the sophisticated insureds exception may apply, the court cannot grant summary judgment in favor of either party where it determines that the Policy is ambiguous.  *See Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F.Supp.2d 756, 785 (N.D. Tex. 2006) (Boyle, J.) ("Summary judgment is generally appropriate only if the language of the contract is wholly unambiguous.").

- 18 -

standard form.[16]  Concerning the production of the form, she stated:
"Marsh will produce it and the carriers review it and either accept
it or decline it."  Ds. Oct. 10, 2009 App. 200.  She indicated that
Marsh's role as broker was to choose the proper coverage for its
clients.  "We [Marsh] actually assess [the clients'] operations,
the coverages [they] may need; and then we go out and place the
insurance with an insurance carrier."  Ds. Oct. 10, 2009 App. 192.
Woodruff testified, however, that she was unfamiliar with the
particular form in question.

       Vought argues that it had no part in negotiating any provision
of the Policy, it never instructed Marsh to negotiate any language
in the Policy, Falvey drafted the Policy on its own form, and a
Falvey executive, Robert E. Falvey, Esquire ("Robert"), testified
to that effect.  But Robert's testimony does not indicate that
Falvey drafted the Policy.  Asked who drafted the Policy, Robert
responded: "I don't know who drafted that.  It is a policy that I -
- I believe [is] provided to us through the broker and from
underwriters."  P. Nov. 6, 2009 App. 377.  In response to a
question about whether Falvey had any role in approving the Policy
language, Robert responded: "Yes, they will.  For periodic
revisions and reviews they will meet and present requests for
clarifications or changes, etc., from time to time."  *Id*.  Vought

---

[16]*See Eagle Leasing*, 540 F.2d at 1260 ("[the policy is a]
'manuscript' policy, containing some standard printed clauses but
confected especially for [the insured].").

- 19 -

also stresses that a high-ranking Marsh executive was unfamiliar with the Policy form. But it is not surprising that the executive in question was unaware of the Policy because he appears to have been involved in handling claims rather than placing policies. Finally, Vought argues that the Marsh broker who placed the Policy had seen the form only once and did not know who drafted the language. That broker agreed to the statement that the Policy "would have been issued by Falvey [from its home office]." P. Nov. 6, 2009 App. 429. He stated that he had used the policy once before, also with Falvey, and that he did not know who prepared the form. He then described the Policy as "a Marsh agreed form with Falvey." *Id.* at 430. And he stated that the Machinery Clause was a "standard clause in a broker's form," *id.*, explaining that brokers tended to draft more expansive terms than did insurers.

Based on the record evidence, the court holds that there is a genuine fact issue as to whether Marsh participated in drafting the Policy. Marsh's main representative to Vought indicated that the Policy was drafted by Marsh, which is in keeping with the insurer's role. And the Policy describes itself as a "manuscript policy." D. Nov. 6, 2009 App. 33. But Marsh's cargo insurance specialist stated that he did not know who wrote the Policy, and that he had seen it only once, and in connection with Falvey. If Marsh participated in the drafting of the form, it is likely that the specialist would have known of its origin. The remaining evidence

is ambiguous and does not clearly show who drafted the Policy.

Accordingly, at the summary judgment stage, the court cannot say definitively that the traditional rule of interpretation does or does not apply.  Although the court cannot determine whether the traditional rule of interpretation applies, it can still determine as a matter of law whether the Policy is ambiguous.  If the Policy is ambiguous, then the trier of fact, in resolving the ambiguity as a factual matter, must first decide the predicate facts that dictate whether the traditional rule of interpretation or the sophisticated insureds exception applies.  The trier of fact must then resolve the ambiguity under the controlling standard (i.e., under the traditional rule of interpretation or the sophisticated insureds exception).  This conclusion is immaterial, of course, as to the Policy provisions that the court concludes below are unambiguous and can be interpreted as a matter of law.

IV

Having addressed this threshold question, the court considers the parties' motions for summary judgment regarding Vought's claim that defendants breached the Policy by failing to pay for "expediting charges" that Vought incurred.

A

When the damaged stabilizer was returned to Vought's facility, Vought modified the assignment of its workers.  Some were tasked with finishing on an expedited basis the next stabilizer in line so

- 21 -

that Vought could provide it to Boeing as a replacement for the damaged stabilizer.  Others were pulled from the main production line to repair the damaged stabilizer.  Vought brought in other workers to replace reassigned members of the regular production line.  By the time Vought finished repairing the damaged stabilizer, it had completed six other stabilizers and shipped them to Boeing.  Vought asserts that the Policy covers three categories of expenses that defendants did not reimburse: (1) the cost of resources brought in to replace workers[17] pulled from Vought's normal production line, (2) the cost of completing and shipping the first stabilizer, and (3) the cost of completing and shipping the next five stabilizers.[18]  The direct cost of completing and shipping the six stabilizers, including the cost of diverting workers from

---

[17]In its brief, Vought states that defendants should have reimbursed the costs of replacing "resources" they took from the main production line.  P. Oct. 9, 2009 Br. 21.  But for factual support, it refers to the affidavit of its benefits accounting manager, who discussed personnel costs exclusively.  P. Oct. 9, 2009 App. 389.

[18]Vought's briefing is unclear concerning how many stabilizers were completed and shipped before the damaged one was returned to Boeing.  In describing coverage for expediting costs, Vought divides its claim into costs for the initial stabilizer and costs for the "completion and shipment of six other replacement stabilizers," i.e., seven new stabilizers total.  P. Oct. 9, 2009 Br. 21 (citing P. Oct. 9, 2009 App. 389-90).  But the affidavit Vought cites in support of this analysis describes one initial replacement stabilizer and five subsequently-completed stabilizers, i.e., six stabilizers in all.  The affidavit comports with Vought's description of the expedited stabilizers elsewhere in its brief. *See id.* at 7 ("[The] repair required that six horizontal stabilizers be completed . . . before the repaired stabilizer was reinserted into the production line[.]").

- 22 -

the normal production line, totals $663,854.00.  Vought seeks an additional $313,730.00 for direct overhead and $172,357.00 for general and administrative costs related to its expedited production of the six stabilizers that preceded the reinsertion of the repaired stabilizer into the production line.

B

Vought contends that reimbursement for these expenses is covered by the Machinery Clause.  The Machinery Clause provides, in relevant part, that, at Vought's election, defendants are liable for the cost and expense of replacing or repairing the damaged stabilizer parts[19] "and all other necessary charges so that the machine or article is restored to its condition at the time of shipment."  Ds. Oct. 10, 2009 App. 15.  Falvey reimbursed Vought for the direct labor costs and fringe benefits paid to workers who worked directly on the damaged stabilizer.  Vought argues that defendants were also obligated to cover the costs of the replacement workers who were added to the normal production line to complete the ensuing six stabilizers.  It posits that it was required to reassign its normal workforce to the repair because they, rather than temporary workers, were alone qualified to handle the repair; it was necessary to replace the resources committed to

---

[19]In considering defendants' liability under the Machinery Clause for expenses related to the six subsequent stabilizers, it is immaterial whether the clause covers the repair of the stabilizer or the repair of the damaged parts of the stabilizer.

the repair in order to maintain a normal production schedule; it would have been practically impossible to conduct the repair had the main line been so deprived of resources that it could no longer function; and such replacement labor costs were literally necessary to repair the damaged stabilizer. Vought also argues that accelerating completion and shipment of the six replacement stabilizers was necessary for it to repair the damaged stabilizer. According to Vought, "[w]hen a complicated piece of equipment, consisting of many parts, is damaged and in need of repair, it can create a gap in shipments, and the insureds' customers' supply line is threatened." P. Oct. 9, 2009 Br. 22.

The court disagrees with Vought's contention that the Machinery Clause affords coverage for replacing resources on its main production line (the first category of expediting costs) or building or shipping the six stabilizers (the second and third categories of expediting costs). Under the clause, Vought had the option to recover the cost of replacing or repairing the damaged stabilizer parts. Regardless which option Vought chose, defendants became liable for any "cost [or] expense of replacing or repairing . . . the lost or damaged part . . . *so that the machine or article is restored* to its condition at the time of shipment." Ds. Oct. 10, 2009 App. 15 (emphasis added). Defendants' liability includes only the expenses necessary to restore a damaged machine or article to its condition at the time of shipment. The Machinery Clause

- 24 -

does not provide that defendants would pay all expenses related to or occasioned by a covered loss.   The expediting expenses that Vought seeks were not necessary to repair the damaged stabilizer. That stabilizer would have been repaired even had the other stabilizers not been completed.   These expediting expenses were incurred to meet separate, preexisting obligations to Boeing.

Interpreting the Machinery Clause,[20] the court holds as a matter of law that defendants were only obligated to cover costs and expenses that Vought incurred to restore the damaged horizontal stabilizer to its condition at the time of shipment.  The Machinery Clause does not allow for coverage of other expenses that Vought incurred for such reasons as the need to satisfy contractual obligations to customers (including Boeing) or the manner in which it operated its production line.

If the Machinery Clause were interpreted as Vought contends, an insured could recover potentially significant costs and expenses that were not necessitated by the repair of the damaged part.  If such potentially open-ended costs and expenses were covered, an insurer could not fairly evaluate the risk it was assuming in exchange for the premium paid.  Its liability would depend, not on what it could reasonably expect to pay for the replacement or

---

[20]Because the Machinery Clause is unambiguous in this respect, the court will not interpret it in favor of Vought.  It is therefore immaterial whether the traditional rule of interpretation or the sophisticated insureds exception would apply in this respect. *See supra* § III(B) (noting this point).

repair of one lost or damaged machine or article, but on a host of ripple effects that the loss or damage caused the insured's business operations and perhaps on the insured's unilateral decisions concerning how to mitigate these effects. Here, defendants accepted the risk of insuring Vought for the cost and expense of replacing or repairing one damaged horizontal stabilizer, not one damaged horizontal stabilizer plus six other horizontal stabilizers that were moving through the production line. Accordingly, Vought cannot rely on the Machinery Clause to recover the expediting costs that it seeks.

C

Vought also relies on the Expediting Cost Clause to recover the costs incurred in completing and shipping the six stabilizers.[21] This clause provides that defendants must in certain circumstances pay "expediting costs involved [with the forwarding of a replacement and/or replacement parts]" and "any overtime repair costs and/or other additional expenses including duties, taxes and destination charges." Ds. Oct. 10, 2009 App. 20. This obligation arises only if the expenses concern a loss that is or will be the

---

[21]In its brief, Vought asserts that the Expediting Clause covers the expedited completion costs as well as the shipping costs. *See* P. Oct. 9, 2009 Br. 23. It apparently does not contend the clause covers the cost of replacing personnel on its regular production line. Regardless, Vought is not entitled to reimbursement for any expenses associated with the manufacturing of the six subsequent stabilizers, including the cost of replacing personnel.

subject of a policy claim, and Vought "considers it necessary to forward replacements and/or replacement parts by means other than the means by which the original shipment was dispatched." *Id.*

1

Vought argues that this clause covers the shipping and manufacturing both of the initial replacement stabilizer and of the others shipped before the damaged stabilizer was repaired and reinserted into the production line. It posits that the clause covers "overtime repair costs" and "other additional expenses." Vought maintains that

> [u]nder the doctrine of *noscitur a sociis* ("a word is known by the company it keeps"), it is clear that "other additional expenses" must include expedited manufacturing costs, because similar costs, like costs of "repair" and "overtime" (which is actually associated with expediting production), are listed in the same provision and are specifically covered.

P. Oct. 9, 2009 Br. 23. Vought also asserts that because the Expediting Cost Clause uses the plural term "replacements" rather than the singular "replacement," all six stabilizers should be covered and that this interpretation provides coverage that meets the foreseeable needs of a supplier of complex machinery, since damage to one product will necessarily affect the insured's current and future obligations.

Defendants respond that Vought's claim fails because the Expediting Cost Clause only applies when the replacement part is sent by a different mode of transportation, such as by air instead

of by ship; these expediting costs amount to delay and disruption costs[22] (pointing out that Vought's second amended complaint describes them as just that), *see* 2d Am. Compl. ¶ 41; expediting costs must be connected to the repair of the single damaged stabilizer; and Vought's costs of expediting are excluded from coverage because they were submitted to another insurer, not to Falvey.  Defendants do not otherwise address the meaning of the Expediting Cost Clause and do not offer an alternative explanation for what could be considered "expediting costs" or "other additional expenses."[23]

---

[22]Section 45, captioned "Delay," provides:

> This insurance is warranted free from, and shall not cover, loss of market or loss, damage, or expense arising from delay, regardless of whether such delay is caused by a risk insured against or otherwise, unless such risks are expressly assumed elsewhere in this policy.

Ds. Oct. 10, 2009 App. 22.

[23]Defendants rely on deposition testimony consisting of opinions offered by employees of Falvey's and Vought's insurance brokers as to what the Policy covers and how it operates.  Besides being parol evidence, the opinions lack foundation.  Because the witnesses do not relate their opinions to the Policy, or otherwise explain how they arrived at those conclusions, the statements are of no use to the court in interpreting the clause.  The interpretation of the Policy by others is of no consequence on a matter of interpretation that the court must conduct as a matter of law.

2

Defendants' initial argument, that the Expediting Cost Clause does not apply unless Vought used a different mode of transportation, is not supported by the language of the Expediting Cost Clause.  The clause is designed to allow Vought to make an expedited shipment of replacements or replacement parts and thereby incur expediting costs for such a delivery.  The "means other than the means by which the original shipment was dispatched" can include a faster version of the same mode of transportation (e.g., via a trucking company who, for an increased fee, guarantees delivery on an accelerated basis rather than on a standard schedule).

The court also disagrees with defendants that Vought is seeking delay and disruption costs.  Section 45 of the Policy excludes coverage for "loss of market or loss, damage, or expense arising from delay" unless this risk is expressly assumed in the Policy.  Vought faced possible fines or damages from Boeing, but it never actually incurred such expenses.  Vought incurred the costs in question *to avoid* loss, damage, or expense arising from delay.  The expenses were not themselves delay and disruption costs.

The court also declines to credit defendants' argument that the court cannot consider whether the Policy covers expediting expenses.  Vought submitted the claim to both Falvey and another insurer so that the insurers could fully evaluate coverage.  In the

claim, it detailed the expenses making up the claim, differentiating between repair costs and expediting costs. Defendants appear to reason that, in doing so, Vought submitted the repair costs to Falvey and the expediting costs to the other insurer. But in submitting its claim, Vought offered no opinion as to which insurer ought to pay which expenses. The entire claim was submitted to Falvey in the first instance, and the court will consider it in its entirety.

3

The court agrees with defendants, however, that the Policy does not cover the costs Vought incurred in manufacturing and shipping on an expedited basis the five subsequent stabilizers. And the court agrees with defendants that the Expediting Cost Clause does not cover the cost of manufacturing, on an expedited basis, the initial replacement stabilizer. But the court concludes that the Expediting Cost Clause is ambiguous regarding whether it covers the cost of shipping the initial replacement stabilizer where, as here, the insured chose to repair and ship the damaged stabilizer.

a

The Expediting Cost Clause must be read in the context of the Policy as a whole. *See Int'l Ins.*, 426 F.3d at 291. Section 16.2 obligates defendants to pay for any physical loss or damage from collision to covered goods during transportation. Where the good

is a machine or an article consisting of multiple parts, the Machinery Clause limits defendants' liability to those parts that were damaged.  But the clause allows Vought to file a claim either for the cost of repairing damaged parts or the cost of replacing them.  The Expediting Cost Clause provides coverage, in addition to the underlying claim, for the insured's costs of expediting the shipment of a replacement and/or replacement part and any overtime repair costs and/or other additional expenses, including duties, taxes, and destination charges.  The question becomes what goods or parts are included in "replacements and/or replacement parts." Vought asserts that the phrase refers to all six additional stabilizers and, presumably, to the repaired stabilizer (for which Falvey has already reimbursed Vought).

The intent of the Expediting Cost Clause is to allow Vought to meet quickly the need of a customer whose good was damaged or lost in shipment.  A single good is replaced once another good meets the previous need; it is not replaced by multiple identical objects. Here, because only one stabilizer was damaged, only one stabilizer can be considered the replacement covered by the Expediting Cost Clause.  Defendants are only responsible for the costs associated with that one replacement stabilizer.

The court therefore rejects Vought's contention that, because the Expediting Cost Clause refers to "replacements," the Policy provides Vought reimbursement for the five subsequent stabilizers

on the Vought production line.  The Expediting Cost Clause provides
coverage for the shipment of multiple replacement parts only if
multiple parts are the subject of the claim.  The five stabilizers
completed after the first one did not replace the damaged
stabilizer; they met separate contractual demands.  The Policy does
not cover any costs——including labor, other direct costs, overhead,
or shipping——attributable to the five subsequent stabilizers.
Defendants are therefore entitled to summary judgment dismissing
this aspect of Vought's breach of Policy claim.  Vought is not
entitled to partial summary judgment in its favor as to this
component of the claim.

b

The Expediting Cost Clause also does not cover the cost of
completing construction of the initial replacement stabilizer.  The
clause provides coverage for "expediting costs," "overtime repair
costs," and "other additional expenses including duties, taxes and
destination charges."  The cost of constructing the initial
stabilizer does not fall within any of these categories.

The meaning of "expediting costs" can be determined from the
context of the clause.  Expediting costs are expenses "involved"
with "forward[ing] replacements and/or replacement parts by means
other than the means by which the original shipment was
dispatched."  Ds. Oct. 10, 2009 App. 20.  The clause relates the
means of forwarding, and therefore expediting costs, to the means

- 32 -

of dispatching the original shipment.  In other words, expediting costs are costs associated with the shipment of the replacement. They do not include labor for original construction.

"[O]vertime repair costs" refers to overtime costs incurred when Vought opts to ship a repaired replacement part.  The costs of *completing* a new stabilizer are not *repair* costs at all, so they cannot qualify as "overtime repair costs."

Nor can the costs of such new construction qualify as "other additional expenses."  Vought argues that "other additional expenses" are mentioned alongside "overtime repair costs," so that the initial term must bear some similarity to the latter specific term.  But the phrase "other additional expenses" comes *after* "overtime repair costs," indicating the additional expenses must be something different.  Indeed, the clause specifies that coverage for "other additional expenses" "includ[es] duties, taxes and destination," indicating the other expenses must be like those stated to be included in the term.  "[D]uties, taxes and destination charges," and the Expediting Cost Clause's focus on transportation-related costs, indicate the phrase "other additional expenses" cannot be read expansively to include such expenses as those incurred in constructing a new replacement part.

c

The court holds that the clause is ambiguous regarding whether it covers Vought's cost of shipping the newly-constructed

replacement stabilizer to Boeing (defendants reimbursed Vought for the cost of shipping the repaired stabilizer). From the perspective of Boeing, the newly-constructed stabilizer replaced the damaged stabilizer. And from the perspective of Vought, this stabilizer met the obligation that it intended to satisfy when it shipped the stabilizer that was damaged in transit. But the court cannot say as a matter of law that the Expediting Cost Clause covers the cost of shipping the entire wing. And it is also ambiguous whether, assuming the clause does cover the entire wing, the clause covers a newly-constructed replacement stabilizer when Vought opted to repair rather than replace the damaged stabilizer.

Where, as here, the covered article consists of multiple parts, the Machinery Clause limits coverage for the loss to the repair or replacement of the damaged part or parts. The Expediting Cost Clause provides coverage for expenses related to shipping "replacements and/or replacement parts." If the Machinery Clause limits Vought's entire claim to the repair or replacement of the damaged part or parts, it would also appear to limit the coverage provided by the Expediting Cost Clause to charges related to the expedited shipment of the covered replacement part or parts. It would not cover shipping costs related to the replacement of the entire machine or multipart article. Vought argues that the Expediting Cost Clause should not be read so narrowly because it provides coverage for replacements, replacement parts, or both.

- 34 -

But this interpretation overlooks the fact that the expedited item must be a covered replacement. If the coverage of the underlying claim is limited to the damaged part or parts, the Expediting Cost Clause only covers costs of shipping the replacements for those parts.

But there is another reasonable interpretation of the Policy: that the Expediting Cost Clause is not limited by the Machinery Clause. Defendants' liability is ultimately created by § 16.2, which provides that defendants are to "pay for . . . any physical loss of or damage to the [covered] goods." Ds. Oct. 10, 2009 App. 10-11. The covered good—the subject of Vought's claim—is the entire stabilizer. While the Machinery Clause limits defendants' liability for the repair of a multipart good such as the stabilizer, the Expediting Cost Clause may operate independently of the Machinery Clause to cover the cost of shipping the entire replacement good, even if only part needed repair.

But there is still another potential meaning. Even if the coverage of the Expediting Cost Clause is not limited by the Machinery Clause (i.e., it covers the shipment of the entire stabilizer, not merely the repaired part), the clause may not cover the shipment of the initial replacement stabilizer. While the Expediting Cost Clause provides coverage for expenses "*in addition to* the underlying claim," Ds. Oct. 10, 2009 App. 20 (emphasis added), the clause does not provide for coverage *unrelated to* the

- 35 -

underlying claim.  In suing for costs associated with the initial stabilizer, Vought is essentially seeking the benefit of replacing the damaged stabilizer.  But Vought elected to repair it, and it made a claim and was paid for costs associated with the repair. Vought's choice to expedite completion and ship a new stabilizer to Boeing is distinct from the underlying claim for costs of repairing the damaged stabilizer.  The Expediting Cost Clause could therefore be reasonably interpreted to apply fully to the return shipment of the damaged stabilizer.

4

In sum, the court holds that the Policy does not cover the cost of replacing resources pulled from the normal production line, the cost of constructing the six stabilizers, or the cost of shipping the five subsequent stabilizers.  The court grants defendants' motion for summary judgment and denies Vought's motion for summary judgment as to these costs.  Because the Policy is ambiguous regarding coverage for the shipment of the initial replacement stabilizer, the court denies the motions for summary judgment of both Vought and defendants as they relate to shipping costs for this stabilizer.  *See Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F.Supp.2d 756, 784 (N.D. Tex. 2006) (Boyle, J.) ("Summary judgment is generally appropriate only if the language of the contract is wholly unambiguous.")

V

Vought also sues to recover overhead expenses related to the repair of the damaged stabilizer.  These expenses consist of $206,920.00 in direct overhead and $77,589.00 in general and administrative costs.[24]

A

The Machinery Clause requires that defendants pay "the cost and expense of replacing or repairing . . . the . . . damaged part . . . and all other necessary charges so that the machine or article is restored to its condition at the time of shipment."  Ds. Oct. 10, 2009 App. 15.  Vought argues that, as a government contractor, it must follow well-defined accounting procedures to allocate general corporate expenses—such as the depreciation of its facilities, lighting bills, and executives' salaries—among its various manufacturing activities, and that these expenses are a cost of repairing the damaged stabilizer.  The court rejects this argument because Vought points to nothing in the Policy indicating that the Policy adopts government contracting regulations.

---

[24]Vought's overhead expenses are comprised of its "direct overhead" and "general and administrative costs."  Direct overhead includes depreciation on facilities, equipment and tools, certain supervisor salaries, and all other costs that do not result from direct labor charges, but that can still be assessed to a particular manufacturing process.  General and administrative costs make up the balance of Vought's corporate expenses that cannot be attributed to specific manufacturing tasks.  They include executives' salaries and benefits for retired workers.  Vought does not assert that Falvey improperly considered direct expenses to be overhead expenses.

Vought also maintains that overhead costs are an inherent part of repair costs. It cites a number of cases in which courts construed insurance policies (usually homeowner policies) to pay an insured the cost of employing a general contractor. The single Texas case is representative of the others. In it, the plaintiff's hotel was damaged by wind and hail. *Ghoman v. N.H. Ins. Co.*, 159 F.Supp.2d 928, 930 (N.D. Tex. 2001) (Kaplan, J.). The plaintiff's property was insured under a policy that required the insurer to reimburse the actual cash value of the damage. *Id*. at 932. That value was calculated by subtracting depreciation from the cost of replacement or repair. *Id*. at 934. The parties disagreed about whether the repair costs included a general contractor's overhead. *Id*. at 931. A general contractor is not paid a specified wage for coordinating a project; rather the contractor is paid "overhead and profit," a percentage of the cost of a project. *See Gilderman v. State Farm Ins. Co.*, 649 A.2d 941, 943 (Pa. Super. Ct. 1994). Because the insurer was required to reimburse the cash value of a repair, rather than the actual costs of the repair, repair costs "include any cost an insured is reasonably likely to incur in repairing or replacing a covered loss." *Ghoman*, 159 F.Supp.2d at 934 (quoting *Salesin v. State Farm Fire & Cas. Co.*, 581 N.W.2d 781, 790 (Mich. Ct. App. 1998)). Even though the plaintiff completed the repair himself, without hiring (or paying) a general contractor, he was entitled to these costs because they were of a

- 38 -

sort reasonably likely to be incurred by an insured.  *Id.*  In other words, the insured was entitled to the amount required to hire an outside professional to complete the repair, even though he performed the repair himself.  Vought thus argues that its overhead costs should be included as a cost of repair.

Vought's argument relies on two assumptions: first, that the cases on which it relies are relevant because the general contractors' "overhead and profits" are essentially equivalent to Vought's "overhead" expenses; and, second, that the Policy requires defendants to pay something akin to the cash value of a repair rather than the actual costs and expenses of making the repair.  In effect, Vought reasons that its costs should include any type of costs and expenses that a third-party would charge for the repair, including overhead expenses.  But the overhead expenses that Vought seeks to recover and the overhead at issue in cases like *Ghoman* are not necessarily identical, despite coincidental names.  A general contractor's overhead is part of the fee for his services.  Rather than charge an hourly or per-job fee, he charges a fee tied to the expense of the project.  The fee reimburses him for his own expenses and provides a profit.  For Vought, however, overhead consists of fixed costs that it incurs at a more general level.  To be profitable, Vought must factor a share of these costs into each product that it sells.  The two types of overhead do, however, have one key common aspect: an insured will incur either cost if he

hires a third party to perform the repair work. Just as a third-party contractor would charge "overhead and profit," another contractor would pass along its fixed "overhead" as a cost of repairing the stabilizer. They are both expenses an insured is reasonably likely to incur.

Defendants argue that another contractor would not have charged overhead for this repair. Where a policy provides cash value for a repair, whether cash value includes a contractor's overhead and profit depends on whether the repair is so complex that hiring a contractor is likely. *See Mee v. Safeco Ins. Co. of Am.*, 908 A.2d 344, 350 (Pa. Super. Ct. 2006). In the case of home repair, if damage is so severe that a number of different trades would be necessary to complete the repair, a general contractor likely would be necessary. Conversely, if the repair were so simple that it could be completed by one tradesman, no general contractor would be needed. Defendants argue that the damage to the stabilizer was minimal——"more of a scrape where lamination was taken off"——as evidenced by the fact that only about $15,000 in materials were necessary to repair it. Ds. Nov. 6, 2009 Br. 11. Further, they contend that it was not necessary for Vought to hire multiple trades; in fact, the stabilizer was a specialized product, and no one other than Vought could perform the work. But defendants' analysis ignores the central point of *Ghoman* and like decisions. The rule is not that overhead is allowable if a

contractor is reasonably necessary to perform the work; instead, it is the rule that, in a cash value policy, an expense is available to an insured, even though he performs the work himself, where he would be reasonably likely to incur that expense if a third party performed the repair. *See Ghoman*, 159 F.Supp.2d at 934. If another contractor performed the same repair work on the stabilizer, it would pass along fixed overhead to Vought.

The question, then, is whether the Policy entitles Vought to recover the actual cash value of the repair or only the cost of the repair. Vought argues that the Policy need not be an actual cash value policy for the rule to apply. It maintains that, in *Ghoman*, the court held that "actual cash value" meant repair costs less depreciation, and that repair costs included any cost an insured would likely incur. Therefore, Vought reasons, the court was really defining "repair costs." But Vought's interpretation isolates that phrase from the rest of *Ghoman*.

In *Ghoman* the policy "provide[d] that the insurance company 'will determine the value of Covered Property in the event of loss or damage . . . [a]t actual cash value as of the time of loss or damage[.]'" *Ghoman*, 159 F.Supp.2d at 931-32 (alterations and ellipses in original). *Ghoman* essentially held that where an insured had purchased cash value coverage, he was entitled to the value of repairing his property, i.e., all expenses he could foreseeably incur in repairing it. *See id.* at 934 ("The court

concludes that 'actual cash value' under the policy means repair or replacement costs less depreciation.  Repair or replacement costs include any cost that an insured is reasonably likely to incur in repairing or replacing a covered loss.") (alteration and internal quotation marks omitted).  The *Ghoman* court thus defined repair or replacement costs, in light of the nature of the policy, to provide the value of the damage.

But the provision under which Vought seeks coverage is different.[25]  It provides for costs and expenses, not value: defendants will pay the "cost and expense of . . . repairing . . . [the] damaged part or parts . . . and all other necessary charges . . . so that the machine or article is restored to its condition at the time of shipment."  Ds. Oct. 10, 2009 App. 15.  Defendants thus did not agree to pay Vought foreseeable expenses of repair, but rather to cover the costs and expenses necessary to restore the damaged stabilizer parts to their condition at the time the

_____

[25]The Machinery Clause states: "This Insurer shall be liable only for the proportion of the insured value applicable to the part or parts lost or damaged, or at the Insured's option, for the cost and expense of replacing or repairing . . . [the] damaged part[.]" Ds. Oct. 10, 2009 App. 15.  Vought opted to seek the cost of repair.  A Vought executive informed Falvey that "Vought has formulated a repair plan for the subject damaged C-17 component part . . . . [It] has, therefore, begun to repair the part accordingly and will aggregate its costs and will subsequently file a claim with each of your companies for reimbursement of those costs[.]"  P. Nov. 6, 2009 App. 55.

stabilizer was shipped.[26]  Vought is therefore owed its costs, not the value of its repair.  Vought's reliance on *Ghoman* and related cases is accordingly misplaced.

B

Vought also relies on the indemnity nature of the Policy to seek the overhead costs.  Citing several cases in which courts awarded overhead costs as part of damages, Vought argues that overhead costs are necessary to make it whole.  *Dillingham Shipyard v. Associated Insulation Co.*, 649 F.2d 1322 (9th Cir. 1981), is representative of these cases, and the only one that involves a contract.

In *Dillingham* a shipyard contracted to install a sonar system in a United States Coast Guard cutter.  *Id*. at 1323.  To perform the work, it subcontracted with a company to install a tile dampening system in an ammunition handling room.  *Id*.  The subcontractor left a leaky gas tank in the room, causing an explosion.  *Id*.  Per its contract with the Coast Guard, the shipyard repaired the damage to the cutter.  *Id*.  The shipyard then sued the subcontractor based on a provision in the subcontract in which the subcontractor promised to indemnify and hold harmless the shipyard for any damages, costs, and expenses paid by the shipyard as a result of the subcontractor's negligence.  *Id*. at 1324.  The

_____

[26]In other words, while "value" should be determined by looking to the market price, "cost" should be determined by looking at actual receipts.

- 43 -

court determined that the indemnification award should include the shipyard's overhead (including overhead attributed to its home office) "because such expenses must be included in the judgment in order to compensate [the shipyard] fully for its costs and expenses in making the repairs." *Id*. at 1326.

But *Dillingham* and the other cases Vought cites do not apply in the insurance policy context. In *Dillingham* the court was attempting to award all costs resulting from a particular event. "It is [a] fundamental principle that reasonable expenses, including overhead expenses, incurred as a result of a breach of contract or a tortious act are proper items of recoverable damages." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 604 (2d Cir. 1989). In the tort or contractual damages context, the court's intent is to make the injured party whole. Because the court's assessment comes after the damage is sustained, the full amount of injury can be accurately assessed. In the insurance context, however, the insurer and the insured bargain for a specific level of reimbursement. In advance of any loss, the insurer calculates the premium to be charged based on the risk it is assuming. Vought and defendants contracted for a specific level of coverage, so the Policy's terms dictate whether Vought is entitled to recover the overhead expenses related to repairing the damaged stabilizer.

C

Vought asserts that its overhead costs should be reimbursed because "[i]n each instance in which the Policy provides that Vought should receive compensation, the Policy itself makes clear that Vought should be fully compensated[.]"  P. Oct. 9, 2009 Br. 19.  It points to § 9.1, which provides that insured goods should be valued at the invoice price; the invoice price, it argues, reflects Vought's overhead.  But Vought ignores the effect of the Machinery Clause, which is to limit a claim for a damaged good consisting of multiple parts to the cost of repairing or replacing the damaged part.  The effect on coverage of that clause is the subject of this dispute.

D

Vought maintains that the expense of operating its business is a necessary cost of repairing the damaged parts in the stabilizer. It reasons:

> Overhead resources that are devoted to a particular project or that occupy a business's time cannot be devoted to alternate income-generating projects.  If overhead costs associated with a repair are not reimbursed, this opportunity cost further reduces the value of the business.  While overhead costs may lack a certain tangible quality, this does not mean they do not exist, that they are not actually incurred in a repair, or that they are not somehow deserving of compensation.

P. Oct. 9, 2009 Br. 17.  In other words, Vought's overall cost of operating its business is one aspect of the cost of everything it

- 45 -

does.   Moreover,   the   use   of   Vought's   equipment,   space,   and
personnel actually reduced the resources the company had available
for other potential projects (i.e., imposed opportunity costs).
Defendants   contend,   however,   that   to   award   Vought   a   portion   of
overhead expenses would unjustly enrich the insured.   At bottom,
they posit, the overhead expenses that Vought seeks would have been
incurred   in   the   same   amount   regardless   of   whether   Vought   had   to
repair the stabilizer parts.

Both   positions   have   some   merit,   and   the   Policy   does   not
clearly answer which position is correct.   The Policy requires
defendants   to   pay   repair   costs   and   expenses   and   "all   other
necessary   charges"   so   that   the   stabilizer   is   restored   to   its
condition at the time of shipment.   On the one hand, Vought would
have   incurred   the   same   costs   of   executives'   salaries   and
depreciation on property if the repair had not been made.   The
expenses could thus be seen as general expenditures, not necessary
charges for repairing the damaged stabilizer.   On the other hand,
Vought   could   not   have   made   the   repair   were   it   not   for   the
infrastructure of personnel, buildings, and equipment in place at
Vought's   facility.     In   this   sense,   the   overhead   charges   were
necessary so that the stabilizer could be repaired.

The   court   therefore   holds   as   a   matter   of   law   that   the
Machinery Clause is ambiguous in this respect.   On the one hand,
"other   necessary   charges"   could   include   overhead   of   some   type,

including some or all of the overhead for which Vought sues in connection with its repair of the damaged stabilizer.[27]   On the other hand, costs and expenses and all other necessary charges could include only direct labor and material costs incurred in making the repair.   Because the Policy is ambiguous in this respect, the court denies the motion for partial summary judgment of Vought,[28] and it denies defendants' motion for summary judgment to the extent it relates to Vought's claim for overhead costs incurred in connection with repairing the damaged stabilizer.   *See Recursion Software*, 425 F.Supp.2d at 785.

VI

The court turns next to Vought's claim that defendants breached the duty of good faith and fair dealing.   Defendants move for summary judgment dismissing this claim.

A

The common law duty of good faith and fair dealing is breached when an insurer denies or delays payment of a claim after its liability has become reasonably clear.   *See Universe Life Ins. Co.*

_____

[27]This ambiguity does not affect the court's decision regarding the six stabilizers because, for the reasons explained, Vought cannot recover any costs, expenses, and charges for the completion of those stabilizers.

[28]Ordinarily, an insured is entitled to have an ambiguity construed in its favor.   But as the court explains *supra* at § III(B), it is possible that the sophisticated insureds exception may apply in this case.   If it does, Vought will not be entitled to the benefit of the ambiguity.

*v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997). "An objective standard is employed to determine 'whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits.'" *Vandeventer v. All Am. Life & Cas. Co.*, 101 S.W.3d 703, 722 (Tex. App. 2003, no pet.) (quoting *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex. 1988)). An insurer does not breach its duty by denying a questionable claim. *See Aranda*, 748 S.W.2d at 213. "[A] bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994). In such instances, the insurer's liability is not reasonably clear. As long as the insurer has a reasonable basis to deny or delay payment of a claim—even if that basis is eventually determined by the fact-finder to be erroneous—the insurer is not liable for the tort of bad faith. *Lyons v. Millers Cas. Ins. Co. of Tex.,* 866 S.W.2d 597, 600 (Tex. 1993).

An insurer cannot escape liability, however, by performing an inadequate investigation. Within the duty of good faith is an insurer's obligation to conduct an adequate investigation of the claim. *United Serv. Auto. Ass'n v. Croft*, 175 S.W.3d 457, 469 (Tex. App. 2005, no pet.). "[A]n insurer cannot insulate itself from bad faith liability by investigating a claim in a manner calculated to construct a pre-textual basis for denial." *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998).

- 48 -

Similarly, an insurer cannot escape liability by "failing to investigate a claim so that it can contend that liability was never reasonably clear." *Universe Life*, 950 S.W.2d at 56 n.5.

B

Vought alleges that defendants breached the duty of good faith by failing to conduct a proper investigation. According to Vought, Falvey's determination of which claims were covered was improper because Falvey instructed the accounting firm that it retained to analyze the claim to exclude overhead costs from its calculation. It also posits that the accounting was improper because the accountant relied on Falvey's interpretation of the Policy rather than on an independent reading. Vought does not argue that using an independent accountant to determine coverage was improper.

A reasonable jury could not find in Vought's favor on this theory. It could only find that the examples of breach on which Vought relies are instances of Falvey's attempting to interpret what the Policy covers. The determinations Falvey made before employing the accounting firm are no different than the decisions it would have needed to make had it determined coverage without outside assistance. That Falvey decided some aspects of coverage before retaining the accounting firm to analyze Vought's claim in detail would not permit a reasonable jury to find that the accountants' report was a pretext to deny most of Vought's claim. Moreover, the accounting firm did not perform an investigation;

instead, it analyzed the expenses that Vought submitted.[29]  Falvey neither disputed that the damage to the stabilizer was an event covered under the Policy nor contended that Vought's expenses (to the extent categorically covered) were unreasonably high.  In fact, the accounting firm recommended making a somewhat higher payment for the expenses it did approve.  The dispute was not factual but interpretive: whether all of the expenses Vought sought to recover were covered by the Policy.

Vought also alleges that Falvey breached this duty by refusing to pay the full claim.  Defendants maintain that Falvey's denials were proper and that its liability for Vought's claimed overhead and expediting expenses was never clear, i.e., that there was a bona fide dispute about coverage.  Indeed, the court has determined that defendants are not liable to Vought for most of the costs associated with the manufacture and shipment of the six stabilizers.  And defendants' liability for Vought's overhead expenses related to the repair of the damaged stabilizer or for the cost of shipping the initial stabilizer is not reasonably clear even now.[30]

---

[29]In *Simmons*, for instance, the court faulted the insurer's investigation for unreasonably concluding that the insureds set the fire that led to the loss and for unreasonably failing to investigate whether others may have started the fire.  *Simmons*, 963 S.W.2d at 45.

[30]Vought also asserts that defendants "flatly misstated the basis for denying Vought's claims by erroneously claiming they arise under the 'Sue and Labor' Clause, rather than the Machinery

Accordingly, the court grants summary judgment dismissing Vought's claim for breach of the duty of good faith and fair dealing.

## VII

Defendants also move for summary judgment dismissing Vought's claim for unfair insurance practices under the Texas Insurance Code.

### A

Vought alleges that defendants violated Tex. Ins. Code Ann. §§ 541.051 to 541.061 and 541.151. Defendants contend that because Vought's common law good faith claim fails, its statutory claim fails as a matter of law. But a "defense to an insured's common law bad faith claim also serves to defeat each of its other extracontractual causes of action *only* if 'each cause was nothing more than a recharacterization of the bad faith claim.'" *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 2009 WL 3074618, at *26 n.28 (N.D. Tex. Mar. 30, 2009) (Fitzwater, C.J.) (emphasis in original) (quoting *Escajeda v. Cigna Ins. Co. of Tex.*, 934 S.W.2d 402, 408 (Tex. App. 1996, no writ)). Two of Vought's statutory allegations are recharacterizations of the common law claim. Vought asserts that defendants failed to effectuate a prompt, fair,

Clause." P. Nov. 6, 2009 Resp. 44. But Vought points to no authority that, where defendants did not deny a claim for which they were clearly liable, they breached the duty of good faith.

- 51 -

and equitable settlement once its liability became clear, and that defendants refused to pay the claim without a reasonable investigation. These claims fail for the same reason as do their common law analogues.

But several other of Vought's statutory claims are not recharacterizations of its common law claim. Vought alleges that Falvey misrepresented the benefits of the Policy; misrepresented the Policy provisions during settlement; failed to promptly explain its denial of the claim; undertook to obtain a full and final release when only a partial payment had been made; failed to affirm or deny coverage within a reasonable time; misrepresented the quality of its services; and failed to disclose material information at the sale of the Policy with the intent to induce Vought to buy a Policy that it would not have otherwise bought. Defendants' defense to the common law claims therefore does not defeat these claims.

B

Defendants also argue that there is no evidence to support the remainder of Vought's statutory allegations. Vought responds by asserting only that Falvey misled it into repairing the stabilizer by withholding its decision not to cover overhead costs.[31]   Vought

---

[31]Vought mentions in passing that Falvey initially stated that Vought's claim was excluded from coverage by the Sue and Labor Clause of the Policy.  It points to a letter sent by Falvey explaining its refusal to pay some of Vought's claim.  But contrary to Vought's contention, Falvey does not in this letter justify its

argues that Falvey convinced it to repair the stabilizer, rather than to declare it a total loss, thus saving defendants over $1 million; that Falvey had a duty as the insurer not to withhold such material information, and that it should not be allowed to profit by its conduct;[32] and that this omission violated Tex. Ins. Code

---

denial on the Sue and Labor Clause; rather, it points to that clause to distinguish the Policy from the policy in *Ghoman*. And Vought does not further describe this conduct or explain how it is illegal. Assuming that Vought has preserved this as a basis for its claim, the court holds that a reasonable jury could not find in its favor on this basis.

[32]In arguing for defendants' statutory liability, Vought mischaracterizes Falvey's role in its decision to repair the stabilizer. In describing the incident earlier in its summary judgment response brief, Vought explains:

> Under the Policy's terms, Vought had the right to decide whether to repair the damaged stabilizer or declare it a total loss. Vought engineers conferred with Boeing and the United States Air Force, and all agreed that repair was possible and that it could be done for significantly less than the stabilizer's $2.5 million invoice price. They also agreed that Vought would have to undertake the repairs itself, because the wing had a highly specialized design and could not feasibly be repaired by any other company.
>
> In a letter dated August 11, 2005, Vought informed Defendants of the repair plan, notified Falvey that Vought would make a claim for reimbursement of the repair costs, and stated its intention to perform the repairs itself[.]

P. Nov. 6, 2009 Br. 4 (citations omitted).

Ann. § 541.061(2), (3), or (4).[33] Defendants reply that Vought could

not have simply declared the stabilizer a loss if it was not cost

effective to do so.[34]

The evidence to which Vought points would not enable a

reasonable jury to find that Falvey violated § 541.061.  Section

541.061 provides:

> It is an unfair method of competition or an
> unfair or deceptive act or practice in the
> business of insurance to misrepresent an
> insurance policy by:
>
> . . .
>
> (2) failing to state a material fact necessary
> to make other statements made not misleading,
> considering the circumstances under which the
> statements were made;
>
> (3) making a statement in a manner that would
> mislead a reasonably prudent person to a false
> conclusion of a material fact; [or]
>
> (4) making a material misstatement of law[.]

Vought has not provided evidence that defendants could be liable

under § 541.061(2) because it has not pointed to a statement that

a reasonable jury could find was rendered misleading by Falvey's

---

[33]Vought neither provides evidence of violations of its other
statutory bases for bad faith nor argues for liability based on
them.  It has therefore failed to raise a genuine issue of material
fact concerning these grounds.

[34]They do not explain, however, why such a claim would have
been impermissible.   Instead,  they  cite  various  individuals'
deposition testimony contained in an appendix to their reply.  The
court resolves the statutory bad faith claims on other grounds and
need not consider this testimony or decide whether it is admissible
at the summary judgment stage.

failure to disclose it would not cover overhead costs.  Nor has Vought pointed to a statement that could be found to violate § 541.061(3).  After Vought informed Falvey that it intended to file a claim for repair expenses, a Falvey officer responded:

> I have received and reviewed the documents [related to the claim], as well as the Preliminary Repair Analysis . . . .
>
> At this point I shall await the results of the repairs and the ensuing repair cost calculations in order to proceed with the claim settlement.
>
> In the meantime, I would appreciate a copy of any contract Vought may have with [the railroad] so that we might evaluate the recovery potential.

P. Nov. 6, 2009 App. 59.  A reasonable jury could not find that anything in this statement should have led Vought to believe it would be reimbursed for overhead.  And Vought has not pointed to a misstatement of law.

In sum, Vought has pointed to no facts that would enable a reasonable jury to find that defendants violated any provision of the Texas Insurance Code.  The court therefore grants summary judgment dismissing Vought's claim under Tex. Ins. Code Ann. §§ 541.051 to 541.061 and 541.151.

VIII

Defendants also move for summary judgment dismissing Vought's claim that defendants breached a contract formed when Vought offered, and defendants agreed, that Vought should perform the repairs on the horizontal stabilizer.

Vought alleges that when it and defendants reached this agreement, Vought became the equivalent of a third-party repair contractor who was entitled to full compensation. Defendants maintain that Vought chose to repair the stabilizer without discussing the matter with them, and that they never agreed to fund the repair. Vought reasons that the Policy provided that defendants would pay for the stabilizer repair, but did not specify that Vought was required to perform the repair itself. It maintains that, by informing defendants that it planned to repair the stabilizer itself, it was making an offer as a third-party contractor. And it contends that defendants accepted the offer.

A valid and enforceable contract requires an offer by one party and an acceptance by the other party, in strict compliance with the terms of the offer. *See Searcy v. DDA, Inc.*, 201 S.W.3d 319, 322 (Tex. App. 2006, no pet.). To obtain summary judgment, defendants can point the court to the absence of evidence to support the claim. *See Celotex Corp.*, 477 U.S. at 325. Vought must then adduce evidence that would permit a reasonable jury to find in its favor.

– 56 –

Regardless whether Vought's communication could be considered an offer, a reasonable jury could not find that defendants expressed an intention to accept the offer. In a response to the letter from Vought describing planned repairs, a Falvey executive referred to a claim under the Policy but stated only that the company would "await the results of the repairs and the ensuing repair cost calculations in order to proceed with the claim settlement." P. Nov. 6, 2009 App. 59. The executive's reference to a claim settlement indicates the correspondence was concerned with defendants' obligations under the existing contract, not under a new contract.

Vought has failed to point to evidence that would permit a reasonable jury to find that defendants accepted Vought's offer in strict compliance with its terms. Defendants are therefore entitled to summary judgment dismissing Vought's claim (count four) that defendants breached the repair agreement.

IX

Defendants move for summary judgment dismissing Vought's promissory estoppel claim. They maintain that Vought cannot establish any of the elements of promissory estoppel, particularly the requirement that defendants promised to pay for the entire cost of the repair.

To be liable for promissory estoppel, defendants must have promised to pay for some portion of the repair that they did not

cover. *See Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 378-79 (Tex. App. 2007, no pet.) (holding that, to be liable for promissory estoppel, defendant must have made promise to perform subject of claim). Vought has failed to point to evidence that would permit a reasonable jury to find defendants made a promise to pay the entire cost of the repair. Defendants are therefore entitled to summary judgment dismissing Vought's claim for promissory estoppel.

X

Defendants move for summary judgment dismissing Vought's claim for quantum meruit.

To prevail on this claim, Vought must prove that "(1) valuable services were rendered; (2) to the party sought to be charged; (3) which services were accepted by the party sought to be charged; (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing such services, expected to be paid by the recipient." *Collins & Aikman Floorcoverings, Inc. v. Thomason* 256 S.W.3d 402, 407-408 (Tex. App. 2008, pet. denied). Vought posits that repairing the stabilizer was a valuable service rendered for defendants and that Vought could justifiably have expected to have been paid at least as much as a third-party contractor hired to make the repairs. Defendants counter that, before Vought undertook the repairs, it did not notify them that they were expected to pay expediting or overhead costs.

Vought has failed to cite evidence that would enable a reasonable jury to find that Vought performed services under such circumstances as reasonably notified defendants that Vought expected to be paid overhead or expediting costs. Because a contract of insurance was in place, a reasonable jury could only find that defendants expected that they would be required to pay Vought as provided under the terms of the Policy. Accordingly, the court grants summary judgment dismissing Vought's quantum meruit claim.

XI

Defendants move for summary judgment dismissing Vought's claim for unjust enrichment. They point to the absence of evidence that they obtained a benefit by fraud, duress, or undue advantage.

"A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex. 1992). Vought argues that Falvey induced Vought to repair the stabilizer under circumstances that suggested that Vought would be fully compensated for its services; Falvey had already decided not to fully fund the repair, and it had a duty to disclose this fact to Vought; and this omission took undue advantage of Vought's willingness to make the repairs itself rather than obtain the services of a third party. Vought reasons that the undue benefit is the amount the third party

would have charged to make the repairs, which includes both overhead and expediting charges, and that defendants received the additional benefit of not having to pay the replacement cost of the stabilizer, which Vought could have sought instead.

A reasonable jury could not find in Vought's favor on this claim. Vought's reasoning is inconsistent with its explanation of the events leading up to the stabilizer's repair. According to Vought, the stabilizer is highly specialized, and only Vought could have made the repair. Vought decided to repair the stabilizer after conferring with Boeing and the Air Force. It did not inform Falvey of its intent to repair the stabilizer until after it had made this decision.[35] Therefore, a reasonable jury could not find that defendants induced Vought to repair the stabilizer itself rather than obtain the services of a third party. Defendants are therefore entitled to summary judgment dismissing Vought's claim for unjust enrichment.

XII

XL moves for summary judgment on the alternative ground that it cannot be liable to Vought because it was at all times acting as an agent for a disclosed principal.

---

[35]As the court explains *supra* at § VIII, a reasonable jury could not find that Vought and Falvey entered into a separate contract that governed the repair of the stabilizer.

A

XL maintains that it acted as an agent for Dornoch, a disclosed principal who was the lead underwriter for Lloyd's Syndicate 1209, and that pursuant to basic principles of agency law, it cannot be held liable. Vought responds that XL never disclosed its agency, and, alternatively, never disclosed the existence or identity of the principal for which it was acting. Vought posits that there is a genuine issue of material fact about XL's liability because, in an answer to an interrogatory, defendants identified XL as an insurer.

B

To determine whether XL qualifies as an agent for a disclosed principal, the court must first analyze the Lloyd's of London ("Lloyd's") insurance market through which the Policy was placed. Lloyd's is not itself an insurance company, but a market in which members may buy and sell insurance. *See Corfield v. Dallas Glen Hills LP*, 355 F.3d 853, 857 (5th Cir. 2003) (citing John M. Sylvester & Roberta D. Anderson, *Is It Still Possible To Litigate Against Lloyd's in Federal Court?*, 34 Tort & Ins. L.J. 1065, 1068 (1999)). Lloyd's members are individuals or corporations called "names"; these names are the parties who actually contract to insure a risk. *Id*. at 858. Lloyd's regulates membership, ensuring the solvency of its members. *Id*. Most names insure risks by forming "syndicates," an administrative entity with no legal status

- 61 -

apart from its names.  *Id.*  Names agree to underwrite a certain
percentage of each risk to which the syndicate subscribes.  On most
policies, the risk is underwritten by several different syndicates,
each of which agrees to be liable for a certain percentage of the
risk.  *Id.*[36]

Each syndicate appoints, by contract, a "managing agent,"
normally a business entity, to be responsible for the management of
the risks underwritten by the syndicate.  *Id.*  The managing agent
typically selects one of its employees to be the "active
underwriter" for the syndicate, who can then buy and sell insurance
on behalf of the syndicate.  *Id.*  "Each Managing Agent is
responsible for its own syndicate's financial well-being; it tries
to attract capital and underwriting business."  *Roby v. Corp. of
Lloyd's*, 996 F.2d 1353, 1357 (2d Cir. 1993).  Managing agents
"among other things, accept or reject the risks submitted for
underwriting, collect premiums, pay losses and disburse all funds."
*Alexander & Alexander Servs., Inc. v. Lloyd's Syndicate 317*, 902
F.2d 165, 166 (2d Cir. 1990).  "Active underwriters and at least
two principals of the managing agency are required to participate
in the syndicates that they manage."  *McAuslin v. Grinnell Corp.*,
2000 WL 1059850, at *2 (E.D. La. Aug. 1, 2000).

---

[36]Liability for each name on a policy is several, not joint.
Names may be liable for any amount, but only for the percentage of
the loss that the name has agreed to cover.  *See E.R. Squibb &
Sons, Inc. v. Acc. & Cas. Ins. Co.*, 160 F.3d 925, 929 (2d Cir.
1998).

Any given policy typically involves multiple syndicates; the syndicates usually designate one of the active underwriters from one of the syndicates as the "lead" underwriter on the policy. *Corfield*, 355 F.3d at 858-59. This lead underwriter is typically the first underwriter to subscribe to a policy and the one to assume the greatest risk. *Id*. at 859. Usually, the lead underwriter is the only name disclosed; the others remain anonymous. *Id*. The insured need only sue the lead underwriter, however, because the typical policy allows one name on the policy to appear as a representative of the rest. *Id*. The typical policy also requires the other names to abide by the final judgment in the lead underwriter's case. *Id*.

Insurance policies must be placed through a Lloyd's approved broker. *Alexander & Alexander Servs.*, 902 F.2d at 166. The broker prepares a "slip" that sets out the insured risk, and it submits it to multiple managing agents. *Id*. A managing agent then indicates whether his syndicate will underwrite any of the risk, and, if so, in what percentage. *Id*. Once the entire risk is subscribed, the broker informs the insured that the insurance has been placed. *Id*. Then the Corporation of Lloyd's, which manages the Lloyd's market, issues the policy through its Policy Signing Office. *Id*. at 166-67. This policy lists the numbers of the subscribing syndicates and the percentage of the risk that each has underwritten. *See*

*Landoil Resources Corp. v. Alexander & Alexander Servs. Inc.,* 720 F. Supp. 26, 27 (S.D.N.Y. 1989).

C

Having set out material aspects of how the Lloyd's insurance market functions, the court now determines whether XL is entitled to summary judgment on the ground that it was acting only as the agent for a disclosed principal. A party forming a contract is presumed to be a party to that contract. *See, e.g., Lake v. Premier Transp.*, 246 S.W.3d 167, 171 (Tex. App. 2007, no pet.). To avoid liability, the agent must disclose both that it is acting in a representative capacity and the identity of its principal.[37] *Id*. Because XL has the burden of proving at trial that it was acting as the agent for a disclosed principal, *see, e.g., Southwestern Bell Media, Inc. v. Trepper*, 784 S.W.2d 68, 72 (Tex. App. 1989, no writ), it can obtain summary judgment on this basis only by making this showing beyond peradventure.

XL points to what it describes as "managing agents' agreements" to demonstrate that it was acting as an agent for Syndicate 1209. One document states that a company called Brockbank Syndicate Management, Limited ("Brockbank") was to serve as agent for Dornoch; another states that Brockbank was to serve as agent for County Down, Limited; and the third states that XL was to

---

[37]XL does not assert that Vought has failed to provide evidence that it is liable for any risk under the Policy.

serve as agent for Stonebridge Underwriting, Ltd.  Even if this evidence establishes XL's actual agency, it does not establish that XL disclosed that agency, or the identity of its principal, to Vought prior to the contract.  Nor does XL point to any other evidence that it disclosed its agency or its principal.

XL's role in insuring the risk is demonstrated by the "Binder for International Transportation Insurance" ("Binder") that was attached to the Policy. The Policy frequently refers to the liability of "the Insurer" without specifically identifying the insurer.  Section 66, captioned "SIGNATURE OF THIS INSURER," states:

> This is to certify that this insurance has been arranged herein as specified 100% with Underwriters at Lloyd's, London, England as per authority granted FALVEY CARGO UNDERWRITING, LTD.  With regard to all references in this policy to the "Company", it is understood and agreed that the Company shall be deemed to be Falvey Cargo Underwriting, Ltd. In WITNESS WHEREOF, This Insurer has executed, issued and delivered this policy at Wakefield, Rhode Island "As Per Declaration Page."

Ds. Oct. 10, 2009 App. 31 (bold font omitted).  The attached Binder provides pertinent terms concerning the Policy, such as the identity of the insured, the interest insured, deductibles, and policy limits.  The Binder includes the declaration that "[t]his is to certify that the undersigned have arranged insurance as hereinafter specified 100% with Underwriters at Lloyd's, London, England as per Covernote JC492803." *Id*. at 46.  Page 2 of the

- 65 -

Cover Note contains the heading, "UNDERWRITERS AT LLOYD'S LONDON BINDING AUTHORITY AGREEMENT," Ds. Oct. 10, 2009 App. 48, and appears to be a standard Lloyd's form.   It grants Falvey the authority "to bind insurance for the Underwriters' account."   *Id*. The final page lists a series of syndicates and the amount of the risk each assumes.   *Id*. at 74.   Following the name of each syndicate are a set of initials and "London."   *Id*.  Above the list are the words "<u>HEREON:</u> 100.0000% Being Order Hereon."   *Id*.   The next line reads, "36.3637% Lloyd's Underwriter Syndicate No. 1209 XL, London."   *Id*.   The other lines list different syndicates with percentages of their risk.

The document does not indicate the identity of "XL, London" or the nature of its relationship to the Policy.   This description suggests that XL is the active underwriter for Syndicate No. 1209 and, because Syndicate No. 1209 assumed the greatest risk on the Policy, that XL is also the lead underwriter on the policy.   While Vought does not contend that XL is the active underwriter, the Binder does not show that XL was acting as an agent or that it disclosed its principal.

Moreover, in response to an interrogatory that asked that defendants "[i]dentify each Underwriting Entity on the Policy," they listed Syndicate 1209 and XL as a "Syndicate Owner."   P. Oct. 9, 2009 App. 240.   This response creates a genuine issue of material fact about whether XL was merely an agent acting for a

disclosed principal, an agent acting for an undisclosed principal, or perhaps itself a principal.   Accordingly, XL's alternative motion for summary judgment is denied.

XIII

Vought moves to exclude certain evidence on which defendants rely in support of their summary judgment motion and to strike defendant's affirmative defense of ambiguity.

A

The court turns first to Vought's motion to exclude evidence. Vought challenges evidence that consists of statements by various employees of Vought, Falvey, and Marsh directly or indirectly indicating their understanding of the Policy's coverage.   Vought contends that this is parol evidence about the meaning of the Policy; the evidence is only admissible to support a defense of ambiguity; and defendants failed to plead this affirmative defense in their answer or elsewhere, as required by Texas law.[38]   Vought maintains that, because defendants' ambiguity argument must be stricken, the parol evidence must be excluded.   Alternatively, Vought argues that if the court holds that the Policy is ambiguous, the meaning of the Policy is a fact issue, and the court cannot consider the parol evidence to grant summary judgment.   Vought also

_____

[38]Both sides maintain that the Policy is unambiguous. Defendants argue in the alternative that, if the Policy is ambiguous, the court should not employ the rule of construction favoring the insured, but should instead rely on parol evidence to interpret the Policy.

contends that defendants' parol evidence is not properly authenticated, and that portions of it constitute evidence of subsequent remedial measures that is inadmissible under Fed. R. Evid. 407.

Defendants respond that whether a policy is ambiguous is a matter of law for the court to determine; they need not have previously pleaded ambiguity for the court to hold that the Policy is ambiguous; the evidence is relevant to Vought's bad faith and unjust enrichment claims; some of the evidence is admissible as a party admission; the evidence is properly authenticated (it consists of deposition testimony or documents attested to by deposition witnesses); and changes to Policy terms are only a subsequent remedial measure where the change is made by the insurer.

B

Fed. R. Civ. P. 8(c) requires that a party specifically plead an affirmative defense. Rule 8(c) contains a nonexclusive list of affirmative defenses that does not include ambiguity. Under Texas law, however, ambiguity is an affirmative defense that must be pleaded. *See Old Republic Sur. Co. v. Palmer,* 5 S.W.3d 357, 360 (Tex. App. 1999, no pet.). Even in a diversity case, however, interpretation of a contract is a matter of law, and the court can conclude that a contract is ambiguous even when no party pleads ambiguity. *See Recursion Software*, 425 F.Supp.2d at 785 (quoting

- 68 -

*In re Newell Indus., Inc.*, 336 F.3d 446, 449 n.5 (5th Cir. 2003));
*Dyll v. Adams*, No. 3:91-CV-2734-D, slip op. at 3 & n.2 (N.D. Tex.
Sept. 30, 1996) (Fitzwater, J.) ("This procedural requirement of
Texas law does not preclude the court from concluding that the
release is ambiguous.  It is well-settled that state procedural law
does not bind a federal court when it sits in a diversity case."),
*aff'd in part, rev'd in part on other grounds*, 167 F.3d 945 (5th
Cir. 1999).

The court has held above, *see supra* § V(C), that the Machinery
Clause is ambiguous concerning whether covered "other necessary
charges" include overhead of some type, including some or all of
the overhead for which Vought sues in connection with repairing the
damaged stabilizer, and is ambiguous concerning whether the
Expediting Cost Clause covers expediting costs.  Therefore, parol
evidence is admissible to determine the meaning of the Policy.
*See, e.g., Nautilus Ins. Co. v. Nicky & Claire's Day Care*, *Inc.*,
630 F.Supp.2d 727, 734 (W.D. Tex. 2009).[39]  The court accordingly
denies Vought's motion to exclude based on the contention that
defendants failed to plead the affirmative defense of ambiguity.

---

[39]Parol evidence is admissible after concluding that a contract
is ambiguous, but such evidence cannot be admitted to determine
whether the contract is ambiguous.  *See Nautilus Ins.*, 630
F.Supp.2d at 734.  In determining whether the Machinery Clause is
ambiguous concerning overhead costs, the court has not considered
parol evidence.

- 69 -

C

The court also declines to exclude the evidence as unauthenticated or as evidence of a subsequent remedial measure. The requirement of authentication is satisfied by evidence sufficient to support a finding that the evidence in question is what its proponent claims. *See* Fed. R. Evid. 901(a). The evidence in question meets the authentication standard. Rule 407 renders inadmissible evidence of remedial measures taken after an injury or harm allegedly caused by an event. Vought argues that this rule applies to changes Vought made to its insurance policies after Falvey denied Vought's claim. But here, the disputed proof is parol evidence about the meaning of the Policy. The court has not relied on parol evidence to determine whether the Policy is ambiguous. Although parol evidence can be relied on to interpret the Policy, the court has not attempted to resolve the ambiguity in the Policy. Therefore, the court denies the motion to exclude.[40]

XIV

Defendants move for leave to file a supplemental appendix. Because consideration of the evidence in the appendix would not alter the reasoning or results of this memorandum opinion and order, the motion is denied as moot.

---

[40]The court has not considered how Rule 407 affects, if it does, the admissibility of defendants' evidence at trial. That decision must await consideration of the evidence to be offered at trial.

*     *     *

For the foregoing reasons, Vought's October 9, 2009 motion for partial summary judgment is denied.  The October 10, 2009 motion for summary judgment of Falvey, Dornoch, and XL is granted in part and denied in part.  Vought's November 6, 2009 motion to exclude evidence and to strike affirmative defense of ambiguity is denied. And defendants' December 7, 2009 motion for leave to file supplemental appendix is denied as moot.

**SO ORDERED.**

June 25, 2010.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

- 71 -